**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

————————————————————

TYLER M.,

                                        Plaintiff,

          v.

                                                         No. 3:19-CV-426
ANDREW SAUL,                                                   (CFH)
Commissioner of Social Security,

                                        Defendant.

————————————————————

**APPEARANCES:**                       **OF COUNSEL:**

Lachman, Gorton Law Firm               PETER A. GORTON, ESQ.
P.O. Box 89
1500 East Main Street
Endicott, New York 13761-0089
Attorney for plaintiff

Social Security Administration         LUCY WEILBRENNER, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza, Rm. 3904
New York, New York 10278
Attorney for defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**[1]

          Plaintiff Tyler M.[2] brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a decision by the Commissioner of Social Security ("the Commissioner"),

---

[1]  The parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. §
636(c), FED. R. CIV. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  See Dkt. No. 7.

[2]  In accordance with guidance from the Committee on Court Administration and Case Management of
the Judicial Conference of the United States, which was adopted by the Northern District of New York in
2018 to better protect personal and medical information of non-governmental parties, this Memorandum-
Decision and Order will identify plaintiff by his first name and last initial.

which denied his application for supplemental security income benefits under Title XVI of the Social Security Act. <u>See</u> Dkt. No. 1. Plaintiff moves for, <u>inter alia</u>, reversal and remand for further administrative proceedings, while the Commissioner cross moves for judgment on the pleadings. <u>See</u> Dkt. Nos. 9, 11.

After a careful review of the record that was before the Commissioner—and applying the requisite deferential standard—for the reasons that follow, the undersigned concludes that the determination resulted from the application of proper legal principles and is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, the plaintiff's motion is denied, and the determination of the Commissioner is affirmed.

## I. Background[3]

### A. Factual Background

Plaintiff was born on November 3, 1990. <u>See</u> T. 36-37. He has an eighth-grade education, although his medical records occasionally reflect that he completed the tenth grade. <u>Compare</u> T. 36-37, 334, 399, <u>with</u> T. 389 ("[h]ighest level of education is tenth grade."), 458. In September 2007, an Individualized Education Program was implemented for plaintiff's 2007/2008 academic year with plaintiff having been identified as a student with a learning disability in reading decoding and written expression. <u>See</u> T. 37-38, 217-224, 288-92.

---

[3] References to the administrative transcript will be cited as "T" and page citations will be to the page numbers in the bottom right-hand corner of the administrative transcript. <u>See</u> Dkt. No. 8. All other citations to documents will be to the pagination generated by the Court's electronic filing system, CM/ECF, and will reference the page numbers in the header, rather than the pagination of the original documents.

Plaintiff's work history is limited, with plaintiff having worked as a laborer from June 2014 through September 2014 and a stocker in September 2014.  <u>See</u> T. 70, 236, 256; <u>but see</u> T. 334 (reporting that plaintiff "last worked in 08/15 as a laborer").  In the past, plaintiff lived with his wife, children, and stepchildren, but at the time of the hearing, he reported living with his girlfriend and his girlfriend's family.  <u>See</u> T. 50, 334.

### B.  Procedural Background

Plaintiff protectively filed an application for supplemental security income, alleging disability beginning on September 25, 2014.[4]  <u>See</u> T. 204-11.  Plaintiff's claim was initially denied on March 1, 2016.  <u>See</u> T. 74-81.  On March 24, 2016, plaintiff requested a hearing that was subsequently held on March 29, 2018 before Administrative Law Judge ("ALJ") Jo Ann L. Draper.  <u>See</u> T. 31-60.  On June 5, 2018, ALJ Draper rendered an unfavorable decision and plaintiff appealed  <u>See</u> T. 9-30, 201-03; <u>see also</u> T. 7-8 (acknowledging plaintiff's request for review).  On February 25, 2019, the Appeals Council denied plaintiff's request for review, making those findings the final determination of the Commissioner.  <u>See</u> T. 1-6.  Thereafter, plaintiff timely commenced this action on April 9, 2019.  <u>See</u> Dkt. No. 1.

---

[4]  Plaintiff previously filed two Title XVI applications.  <u>See</u> T. 63.  The first was filed on November 2, 2010 and denied on December 31, 2010.  <u>See</u> T. 63. The second claim was filed on April 21, 2011 and was denied on June 24, 2011.  <u>See</u> T. 63.  The ALJ determined that there was no basis for reopening the prior applications.  <u>See</u> T. 12 (citing 20 C.F.R. § 416.1488).  The ALJ also considered, and rejected, the application of Social Security Ruling 91-5p, Titles II and XVI: Mental Incapacity and Good Cause for Missing the Deadline to Request Review, 1991 WL 208067 (S.S.A. July 1, 1991).  <u>See</u> T. 12.

## C.  The ALJ's Decision

Applying the five-step sequential analysis, the ALJ first determined that plaintiff had not engaged in substantial gainful activity since November 6, 2015.  See T. 15 (citing 20 C.F.R. § 416.920(b), 416.971 et seq.).  At step two, the ALJ found that plaintiff suffers from several severe impairments, including "learning disorders, asthma, sarcoidosis, social anxiety disorder, substance induced anxiety and depressive disorder, and attention deficit disorder[.]"  T. 15-16 (citing 20 C.F.R. § 416.920(c)).  Proceeding to step three, the ALJ held that plaintiff's impairments—including his substance use disorder—satisfied the criteria for Listing 12.06.[5]  See T. at 16-17; see also 20 C.F.R. Pt 404, Subpt. P, App. 1, § 12.06 ("Anxiety and obsessive-compulsive disorders").  ALJ Draper then concluded that in the absence of substance of abuse, plaintiff's physical and mental impairments would continue to be severe, but that he "would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 [C.F.R.] Part 404, Subpart P, Appendix 1[.]"  Id. at 17-19 (citing 20 C.F.R. § 416.920(d)).

Proceeding to the next step, the ALJ determined that in the absence of plaintiff's substance abuse, plaintiff would retain the residual functional capacity ("RFC"):

> to perform medium work . . . except he can have no exposure to excessive pulmonary irritants such as fumes, odors, dust, and gases.  He could perform tasks learned in 30 days or less involving simple, work-related decisions requiring little to no judgment with only occasional workplace changes.  He can have no interaction with the public and no

---

[5] On January 17, 2017, the revised medical criteria for mental disorders went into effect and applied to decisions rendered on or after that date.  See Genua v. Comm'r, No. 18-CV-423 (MJR), 2019 WL 5691827, at *4 (W.D.N.Y. Nov. 4, 2019); see also 20 C.F.R. Part 404, Subpt. P, App. 1 (effective Jan. 17, 2017).  In order to satisfy the revised criteria for Listing 12.06, a plaintiff "must meet the requirements of sections 12.06A and either 12.06B or 12.06C."  Torres v. Berryhill, No. 16-CV-02354 (FB), 2018 WL 1440533, at *3 (E.D.N.Y. Mar. 22, 2018) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06A-C).  Here, ALJ Draper expressly considered section 12.06A in conjunction with section 12.06B.  See T. 16-17.

> more than occasional interaction with coworkers or
> supervisors.  He is unable to work in close proximity to
> others (not standing next to and not being involved in tasks
> being performed by others).

T. 19-24 (citing 20 C.F.R. § 416.967(c)).  In considering plaintiff's mental impairments

the ALJ concluded that limitations of simple, work-related decisions, nonjudgment,

occasional workplace changes, no public interaction, no work in close proximity to

others, and no more than occasional interaction with co-workers and supervisors" was

sufficient to accommodate both plaintiff's subjectively reported limitations, as well as the

restrictions set forth in his medical records.  See T. 22-24.

At step five, the ALJ determined that when considering plaintiff's age, education,

work experience, and his RFC, in the absence of substance abuse, plaintiff could still

perform a significant number of jobs in the national economy.  See T. 24-25 (citing 20

C.F.R. §§ 416.960(c), 416.966).  This encompassed medium, unskilled occupations—

with a level two Specific Vocational Preparation ("SVP")—including a stubber (DOT

code 222.687-034), spiral binder, and pork cutlet maker (DOT code 529.686-022).  See

T. 25.  Ultimately, ALJ Draper determined that "[b]ecause the substance use disorder is

a contributing factor material to the determination of disability, the [plaintiff] has not been

disabled within the meaning of the Social Security Act at any time from the date the

application was filed through the date of this decision."  T. 25 (citing 20 C.F.R. §§

416.920(g), 416.935).

### D.  The Arguments of the Parties

In support of reversal, plaintiff advances several interrelated arguments.  See

Dkt. No. 9.  First, plaintiff argues that the RFC is unsupported by substantial evidence

because ALJ Draper failed to assess any limitations to plaintiff's work pace and/or attendance. See id. at 8-11. Second, he argues that the ALJ improperly weighed certain medical opinions. See id. at 12-20. Third, plaintiff argues that the conclusion that plaintiff was capable of working a position with a level two SVP is inconsistent with his social limitations. See id. at 20-21. Finally, plaintiff argues that the ALJ's conclusion at step five is not supported by substantial evidence because it failed to account for the full extent of plaintiff's limitations. See id. at 21-22.

The Commissioner argues in opposition that the ALJ properly weighed all of the medical opinions in arriving at plaintiff's RFC. See Dkt. No. 11 at 4-11. Second, the Commissioner argues that the SVP determination is irrelevant to plaintiff's social limitations. See id. at 11-12. Finally, the Commissioner argues that the step five determination was supported by substantial evidence. See id. at 12-13.

## II.  Legal Standards

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. § 405(g); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the determination of the Commissioner will only be reversed if the correct legal standards were not applied, or the determination was not supported by substantial evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

6

Substantial evidence is "more than a mere scintilla," which means that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). Under this standard, "once an ALJ finds facts, we can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)). Substantial evidence is "a very deferential standard of review-even more so than the 'clearly erroneous' standard." Brault, 683 F.3d at 448 (quoting Dickinson v. Zurko, 527 U.S. 150, 153 (1999)).

Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence. See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986). However, if the correct legal standards were applied—and the ALJ's finding is supported by substantial evidence—the determination must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

### B. Determination of Disability[6]

---

[6] The analysis of supplemental security income benefits under Title XVI parallels, in relevant part, the statutory and regulatory framework applicable to disability insurance benefits claims under Title II. See Franki L. v. Comm'r of Soc. Sec., No. 6:18-CV-741 (GLS), 2019 WL 4736469, at *1 n.2 (N.D.N.Y. Sept. 27, 2019) (citing Barnhart v. Thomas, 540 U.S. 20, 24 (2003)).

"Every individual who is under a disability shall be entitled to a disability . . .

benefit[.]" 42 U.S.C. § 423(a)(1).  Disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of

not less than 12 months." Id. § 423(d)(1)(A).  A medically-determinable impairment is

an affliction that is so severe that it renders an individual unable to continue with his or

her previous work or any other employment that may be available to him or her based

upon age, education, and work experience.  See id. § 423(d)(2)(A).  Such an

impairment must be supported by "medically acceptable clinical and laboratory

diagnostic techniques." Id. § 423(d)(3).  Additionally, the severity of the impairment is

"based on objective medical facts, diagnoses[,] or medical opinions inferable from [the]

facts, subjective complaints of pain or disability, and educational background, age, and

work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3

(S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.

1983)).

The Second Circuit employs a five-step analysis to determine whether an

individual is entitled to disability benefits.  See 20 C.F.R. §§ 404.1520, 416.920.  In

particular,

> First, the [Commissioner] considers whether the [plaintiff] is
> currently engaged in substantial gainful activity.
>
> If [the plaintiff] is not, the [Commissioner] next considers
> whether [he or she] has a "severe impairment" which
> significantly limits his [or her] physical or mental ability to do
> basic work activities.
>
> If the [plaintiff] suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the [plaintiff] has

8

an impairment which is listed in Appendix 1 of the regulations.  If the [plaintiff] has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a [plaintiff] who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the [plaintiff] does not have a listed impairment, the fourth inquiry is whether, despite the [plaintiff]'s severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the [plaintiff] is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the [plaintiff] could perform.

Berry, 675 F.2d at 467 (2d Cir. 1982) (spacing added).  At the first four steps of the analysis, the plaintiff bears the initial burden of proof.  See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, then the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  See DeChirico, 134 F.3d at 1180 (citing Berry, 675 F.2d at 467).

Moreover, as relevant to this matter, Congress amended the Social Security Act in 1996 to preclude a finding of disability—and an entitlement to benefits—"if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 123 (2d Cir. 2012); Smith v. Comm'r of Soc. Sec. Admin., 731 F. App'x 28, 30 (2d Cir. 2018) (summary order) ("Drug addiction is a material factor if the individual would not be found disabled if she stopped using drugs.").  Thus, "[w]hen there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis."  Cage, 692 F.3d at 123; see Social Security Ruling ("SSR")

13-2p, Titles II and XVI: Evaluating Cases Involving Drug Addiction and Alcoholism (DAA), 2013 WL 621536 (S.S.A. Feb. 20, 2013).  In such cases, a secondary analysis must be conducted to determine whether the plaintiff's drug addiction or alcoholism is material to the initial finding of disability.  See 20 C.F.R. §§ 404.1535(a), 416.935(a).  A "key factor" under the secondary analysis is whether the plaintiff would still be found disabled if they stopped using drugs or alcohol.  See id. §§ 404.1535(b)(1), 416.935(b)(1).  In making this determination, the administrative adjudicators first determine whether physical and mental limitations would remain if the plaintiff stopped using drugs or alcohol, and if so, whether those remaining limitations are disabling on their own.  See id. §§ 404.1535(b)(2), 416.935(b)(2).  If so, a plaintiff is considered disabled within the meaning of the Social Security Act notwithstanding his or substance abuse.  See id. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).  If not, the substance abuse is considered material, and the plaintiff is not eligible for benefits under the Social Security Act.  See id. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i).

### III.  Relevant Medical Evidence

In reaching her determination that plaintiff was not disabled within the meaning of the Social Security Act, ALJ Draper weighed and considered the opinions of—among others—consultative examiner Amanda Slowik, Psy.D., see T. 338-43, consultative examiner Gilbert Jenouri, M.D., see T. 344-48, Family Nurse Practitioner Ryan D. Little, see T. 394-407, 433-436, 452-455, Pulmonologist Regina Frants, M.D., see 408-32, 441-55, and state-agency psychological examiner D. Brown, Psy.D., see T. 67-70. Because plaintiff's arguments rely principally upon the opinions of those medical

practitioners that specifically opined on the limitations that resulted from plaintiff's mental conditions, the opinions of those three practitioners are outlined more fully below.

## A.  Amanda Slowik, Psy.D.

On February 12, 2016, Dr. Amanda Slowik ("Dr. Slowik")—a psychiatric consultative examiner—evaluated plaintiff, who was present for that examination with his mother.[7]  See T. 338-43.  Plaintiff was cooperative for purposes of the evaluation, had normal posture and motor behavior, and adequate expressive and receptive language skills.  See T. 335.  Plaintiff's social skills were "somewhat lacking" and his eye contact was "minimal."  See T. 335.  Dr. Slowik described plaintiff's thought process as "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia" and she noted that he possessed a full range of affect, appropriate speech and thought content, neutral mood, and clear sensorium.  See T. 335.  As a result of an intellectual function within the borderline range, Dr. Slowik observed that plaintiff's attention, concentration, and memory skills were moderately to markedly impaired.  See T. 336.  Plaintiff also exhibited limited insight and questionable judgment.  T. 336.

Plaintiff recounted to Dr. Slowik that he showered approximately two times per week and had no trouble with laundry.  See T. 336.  Due to difficulties in following directions, plaintiff did not "do much food preparation or cooking" and he often relied on others for tasks such as grocery shopping and money management.  See T. 336-337.

---

[7]  As indicated supra, the revised medical criteria for evaluating mental disorders went into effect on January 17, 2017.  Because the Dr. Slowik's evaluation was conducted prior to January 17, 2017, the evaluation was based upon the then-existing Social Security standard.  See Seiler v. Comm'r of Soc. Sec., No. 19-CV-602S (WMS), 2020 WL 4015258, at *2 (W.D.N.Y. July 16, 2020)

Plaintiff does not drive, but "would be able to take public transportation if necessary." T. 336-37. Plaintiff recited that his hobbies included "watching TV, playing video games, and listening to music." T. 337.

Dr. Slowik diagnosed plaintiff with attention deficit hyperactivity disorder by report and a history of cannabis abuse in sustained remission.[8] See T. 337. She opined that plaintiff's "ability to follow and understand simple directions and instructions and perform simple tasks independently" was mildly limited. T. 337. In addition, Dr. Slowik opined that plaintiff's ability to maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, and appropriately deal with stress" was moderately to markedly limited. See T. 337. Dr. Slowik likewise opined that plaintiff's "ability to relate adequately with others" was also moderately limited. T. 337. These difficulties were caused by anger management issues, cognitive deficits, and distractibility. See T. 337.

In her decision, ALJ Draper afforded this opinion "partial weight." T. 22. In so holding, the ALJ noted observed plaintiff's performance on the mental status examination supported Dr. Slowik's opinion that plaintiff possessed a limited ability to complete complex tasks. T. 22. However, ALJ Draper expressly rejected additional

---

[8] Dr. Slowik also indicated a "provisional" diagnosis of intermittent explosive disorder and the need to "rule out" an intellectual disability. T. 337. "Rule out" means to eliminate or exclude something from consideration and it, therefore, does not constitute a diagnosis." Merancy v. Astrue, No. 3:10-CV-1982 (MRK)(WIG), 2012 WL 3727262, at *7 (D.Conn. May 30, 2012) (citing cases). "Provisional," on the other hand, means that "there is a strong presumption that the full criteria will ultimately be met for a disorder but not enough information is available to make a firm diagnosis." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 23 (5th ed. 2013). In any event, neither a "rule out" or "provisional diagnosis" is an affirmative diagnosis. See Jackson v. Berryhill, 694 F. App'x 39, 41 (2d Cir. 2017) (summary order) (noting that "rule out" diagnoses "indicated that the disorders were possible diagnoses that had not been ruled out, pending further evaluation"); Merancy v. Astrue, No. 3:10-CV-1982 (MRK/WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012) (collecting cases); Keo v. Comm'r of Soc. Sec., No .09-CV-2019 (CMK), 2010 WL 4905283, at *7 (E.D. Cal. Nov. 24, 2010) (noting that a provisional diagnosis cannot be equated with a diagnosis).

mental limitations because plaintiff demonstrated an ability to understand and participate in cognitive testing, and was also found to have fair attention and concentration, intact memory, and normal mood and affect.  T. 22.

### B.  Family Nurse Practitioner Ryan D. Little

On at least two different occasions, plaintiff sought medical treatment from Family Nurse Practitioner Ryan D. Little ("N.P. Little").  See T. 394-407, 433-436, 452-455.  First, on May 18, 2017, plaintiff presented to N.P. Little to establish care with the practice and for additional complaints of, inter alia, right shoulder pain.  See T. 400.  The treatment note indicates that plaintiff's medical history was significant for having been diagnosed in March 2011 with asthma and attention deficient hyperactivity disorder; both of those conditions are described by N.P. Little as "chronic."[9]  See T. 400.

Thereafter, on November 27, 2017, plaintiff presented with complaints of hand pain, a foot lesion, as well as anxiety following his transportation pursuant to the Comprehensive Psychiatric Emergency Program ("CPEP") under N.Y. Mental Hygiene Law § 9.41 earlier in the year.[10]  See T. 396-399; see also T. 388-93.  The treatment note describes plaintiff's depression as "acute" and his prescriptions for fluoxetine, hydroxyzine, and trazadone were renewed at that appointment  See T. 396, 398-99.

On February 2, 2018, N.P. Little completed the first of two medical source statements.  T. 405-07.  In the first, N.P. Little indicated that although he was treating

---

[9]  The March 2011 onset of asthma and attention deficient hyperactivity disorder also appears in an office visit note from Dr. Lisa Rodriguez on July 25, 2014.  See T. 293-96.

[10]  Although the CPEP admission occurred prior to plaintiff's first visit to N.P. Little on May 18, 2017, it is not mentioned in the office visit note from that date.  See T. 400-04.

plaintiff for left hip and back pain, he was unable to provide any information on plaintiff's restrictions due to the limited "background data/workup." T. 405. N.P. Little opined that plaintiff would be off task between 15% and 20% of his day and absent at least three days per month due to his severe social anxiety, agoraphobia, and anxiety/depression. See T. 407.

N.P. Little completed a second medical source statement on March 9, 2018.[11] See T. 433-36, 452-455. In the portion related to plaintiff's physical impairments, N.P. Little describes plaintiff as suffering from chronic low back pain and left hip pain, but he does not assign any limitations to those conditions due to the failure to "follow[] recommendations." T. 452-53. In the portion related to plaintiff's mental impairments, N.P. Little indicated that he exhibited a number of limitations due to his social anxiety disorder and attention deficient hyperactivity disorder. See T. 433-36. More specifically, N.P. Little opined that plaintiff exhibited an "extreme" limitation with respect to his ability to maintain attention and concentration and ability to maintain regular attendance without interruptions from psychological bases symptoms, and a "marked" limitation in his ability to perform activities within a schedule, ability to be punctual, consistency in pace, ability to act appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, ability to get along with co-workers, and the ability to respond appropriately to ordinary stressors in a work setting with simple tasks. See T. 433. N.P. Little further opined that plaintiff could be

_____

[11] The administrative transcript divides N.P. Little's second medical source statement into two separate statements, with one described as undated—and relating to plaintiff's physical impairments—and the other described as having been completed on March 9, 2018—and relating to plaintiff's mental impairments. See T. 433-36 (March 9, 2018), 452-455 (undated). Based upon the identical fax headers, however, it appears that this was a single medical source statement. See T. 433-36, 452-455.

expected to be off task for more than 33% of his work day and absent for more than three days in a month.  T. 434.

In assessing plaintiff's RFC, ALJ Draper afforded N.P. Little's opinion "little weight."  T. 23.  The  ALJ considered—among other factors—N.P. Little's treatment relationship with plaintiff, whether his opinion on plaintiff's limitations was fully explained and supported by the medical evidence, and whether his opinion was consistent with the record as a whole.  See T. 23 (citing 20 C.F.R. §416.927(f)).  ALJ Draper expressly rejected the "extreme" and "marked" limitations as being inconsistent with the medical record.  See T. 23.

### C.  D. Brown, Psy.D.

On March 1, 2016, psychological consultant D. Brown, Psy.D. ("Dr. Brown"), conducted a psychiatric review technique assessment and mental residual functional capacity assessment as part of the initial determination of plaintiff's claim  See T. 67-70.  With respect to mental functional capacity, Dr. Brown indicated that plaintiff had understanding and memory limitations, which resulted in a moderate limitation to plaintiff's ability to understand and remember detailed instructions.  See T. 68.  Dr. Brown also determined that plaintiff had sustained concentration and persistence limitations, which resulted in moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and work in coordination with, or in proximity to, others without distracted by them.  See T. 68-69.

Dr. Brown opined that plaintiff was moderately limited in his abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  See T. 69.  In addition, Dr. Brown determined that plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others.  See T. 69.  Dr. Brown concluded that plaintiff retained the ability to perform the basic demands of simple work so long as that work was not performed in close contact with others.[12]  See T. 70.

ALJ Draper afforded Dr. Brown's opinion "some weight."  T. 23-24.  In so holding, ALJ Draper observed that the opinion was "generally consistent with the overall evidence in the record."  T. 24.

## IV.  Legal Analysis

### A.  Whether the RFC Was Supported by Substantial Evidence

Plaintiff argues that the RFC is unsupported by substantial evidence because the ALJ improperly weighed medical opinions and failed to account for restrictions in plaintiff's work pace and attendance.  See Dkt. No. 9 at 8-20; Dkt. No. 12 at 1-3.  An RFC is defined as "'what an individual can still do despite his or her limitations[.]'"  Pardee v. Astrue, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting Melville v. Apfel,

---

[12]  "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  SSR 85-15, The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments ("SSR 85-15"), 1985 WL 56857, at *4 (S.S.A. Jan. 1, 1985)).

16

198 F.3d 45, 52 (2d Cir. 1999)).  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.'"  Melville, 198 F.3d at 52 (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p")), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. Balles v.  Astrue,  11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing Melville, 198 F.3d at 52)

Generally, "'[i]n making [the] [RFC] determination, the ALJ must consider [the plaintiff]'s physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.'" Orton v. Astrue, No. 7:11-CV-630 (FJS/ATB), 2013 WL 3328025, at *16 (N.D.N.Y. July 2, 2013) (quoting Tilbe v. Astrue, No. 5:10-CV-910 (NAM/ATB), 2012 WL 2930784, at *11 (N.D.N.Y. July 17, 2012)).  "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'"  Hendrickson v. Astrue, 5:11-CV-927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting SSR 85-15, 1985 WL 56857, at *6).  The RFC determination "must be set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence."  Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

In arriving at the plaintiff's RFC, the ALJ is tasked with the responsibility of reviewing all the evidence, resolving inconsistencies, and making a determination that is consistent with the evidence as a whole.  See Camarata v. Colvin, No. 6:14-CV-0578

(MAD), 2015 WL 4598811, at *9 (N.D.N.Y. July 29, 2015) (quoting Galiotti v. Astrue, 266 F. App'x 66, 67 (2d Cir. 2008) (summary order)).  "An ALJ does not have to strictly adhere to the entirety of one medical source's opinion."  Warren v. Comm'r of Soc. Sec., No. 3:15-CV-1185 (GTS/WBC), 2016 WL 7223338, at *7 (N.D.N.Y. Nov. 18, 2016) (subsequent history omitted).  As a result, the RFC formulated by the ALJ need not "perfectly correspond with any of the opinions of medical sources cited in his decision, [because an ALJ is] entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."  Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order); see Cichocki v. Astrue, 729 F.3d 172, 178 n.3 (2d Cir. 2013) ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the reviewing] to glean the rationale of an ALJ's decision.'" (quoting Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983))).

In addition, because Social Security adjudications are not a traditional adversarial proceeding, the ALJ has a duty to "investigate and develop the facts and develop the arguments both for and against the granting of benefits."  Vincent v. Comm'r of Soc. Sec., 651 F.3d 299, 305 (2d Cir. 2011); see Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33 (2d Cir. 2013) (noting the ALJ's responsibility to investigate).  However, "remand is not required where the record contains sufficient evidence from which the ALJ can assess the plaintiff's RFC."  Atiyeh v. Comm'r of Soc. Sec., No. 5:16-CV-392 (ATB), 2017 WL 74717, at *7 (N.D.N.Y. Jan. 6, 2017);

In this case, ALJ Draper surveyed the record and determined that plaintiff retains the RFC—despite his physical and mental impairments—to perform medium work as

defined in 20 C.F.R. §§ 404.1567(c), 416.967(c),[13] subject to the following additional

restrictions:

> [H]e can have no exposure to excessive pulmonary irritants
> such as fumes, odors, dust, and gases.  He c[an] perform
> tasks learned in 30 days or less involving simple, work-
> related decisions requiring little to no judgment with only
> occasional workplace changes.  He can have no interaction
> with the public and no more than occasional interaction with
> co-workers or supervisors.  He is unable to work in close
> proximity to others (not standing next to and not being
> involved in tasks being performed by others).

T. 19.  Moreover, in order to account for the impact of his mental impairments, ALJ

Draper concluded that plaintiff would be further limited to "simple, work-related

decisions, no judgment, occasional workplace changes, no public interaction, no work in

close proximity to others, and no more than occasional interaction with co-workers and

supervisors[.]"  T. 22.

### 1.  Whether the ALJ Erred in Weighing the Medical Opinions

Plaintiff argues that ALJ erred in the manner in which she weighed the medical

opinion evidence.  See Dkt. No. 9 at 12-20.  Plaintiff takes issue with the ALJ's

assignment of "partial weight" to the opinion of Dr. Slowik, "little weight" to the opinion of

N.P. Little, and "some weight" to the opinion of Dr. Brown.  Dkt. No. 9 at 12-20; Dkt. No.

12-1.  A careful review of the record reveals that plaintiff's argument is without merit.

---

[13]  Medium work involves "lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds and standing for approximately six hours out of an eight-hour work day."  Urtz v. Acting Com'r of Soc. Sec., 159 F.3d 1349 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1567(c), 416.967(c)).  A person who is deemed able to medium work is also capable of performing sedentary and light work.  See 20 C.F.R. §§ 404.1567(c), 416.967(c).

Although an ALJ will consider medical opinions regarding a plaintiff's functioning, ultimately the ALJ is tasked with reaching an RFC based on the record as a whole. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("Although we consider opinions from medical sources on issues such as . . . residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."). As a result, "[r]egardless of its source," the regulations require that every medical opinion be evaluated. See 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ must consider a number of factors, such as, "examining history, treating relationship, supportability, consistency, and specialization to decide the proper weight afforded to each opinion." Emsak v. Colvin, No. 13-CV-3030, 2015 WL 4924904, at *10 (E.D.N.Y. Aug. 18, 2015); 20 C.F.R. § 416.927(c)(1)-(6); see generally SSR 06-03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" In Disability Claims; Considering Decisions On Disability by Other Governmental and Nongovernmental Agencies ("SSR 06-03p"), 2006 WL 2329939, *2-*3 (S.S.A. Aug. 9, 2006).

Initially, plaintiff refers to N.P. Little as a "treating source," seemingly to imply that his opinion is entitled to controlling weight or special deference. See Dkt. No. 9-10. A nurse practitioner, however, is not an "acceptable medical source," whose medical opinions can be entitled to controlling weight.[14] See Monette v. Colvin, 654 F. App'x 516, 518 (2d Cir. 2016) (summary order); Coyle v. Comm'r of Soc. Sec., No. 5:17-CV-

---

[14] For claims that were filed on or after March 27, 2017, a nurse practitioner is considered an acceptable medical source. Compare 20 C.F.R. § 416.927, with 20 C.F.R. § 416.920c. Because plaintiff filed his claim prior to March 27, 2017, his claim must therefore be analyzed under the earlier regulations. See Claudio v. Berryhill, No. 3:17-CV-1228 (MPS), 2018 WL 3455409 at *3 n.2 (D. Conn. July 18, 2018) ("Since [the plaintiff] filed [the] claim before March 27, 2017, I apply the treating physician rule under the earlier regulations.").

0924 (WBC), 2018 WL 3559073, at *6 n.2 (N.D.N.Y. July 24, 2018) ("Although a nurse practitioner may be a treating health care provider, not all treating health care providers are 'treating sources' under the applicable Social Security Regulations."); SSR 06-03p, , 2006 WL 2329939, *2 (noting that a nurse practitioner is considered an "other source" rather than an "acceptable medical source").  As a nurse practitioner, N.P. Little is an "other source" within the meaning of the applicable regulations.  Although an "other source," such as N.P. Little, may have been able to provide insight into the severity of plaintiff's impairments and how those impairment impact his ability to function, N.P. Little's treatment notes fail to reflect any particular "special knowledge" of plaintiff.  See SSR 06-03p, 2006 WL 2329939, at *2.

In affording N.P. Little's opinion "little weight," ALJ Draper outlined a number of reasons for discounting his opinion, including that (1) N.P. Little was not a mental health specialist and was not qualified to render an opinion on the effects of plaintiff's mental impairments; (2) the limited treatment rendered by N.P. Little was for plaintiff's physical—rather than mental—conditions; (3) the opinion was not consistent with objective clinical findings, including cooperative presentation, normal mood and affect, and stable cognitive findings; and (4) N.P. Little had a relatively limited examining relationship with plaintiff.  See 20 C.F.R. § 416.927(c)(1)-(6).  Although N.P. Little opined that plaintiff exhibited "extreme" limitations with respect to plaintiff's ability to maintain attention and concentration and ability to maintain regular attendance without interruptions and "marked" limitations in all other areas, see T. 433, these limitations were not supported by N.P. Little's treatment notes, which reveal that he did not, at any point, conduct an examination of plaintiff's mental status or perform any objective

testing that would support his conclusion that plaintiff exhibited "extreme" and "marked" limitations, would be off task more than 33% of his day, or would be absent more than three times per month.  See T. 394-404, 433-34.  N.P. Little did not cite any specific behavior patterns or incidents that were illustrative of plaintiff's "marked" or "extreme" limitations in his concentration and pace, interactions with orders, or stress.  See T. 394-404, 433-34.  N.P. Little's opinion was also out of line with the opinions of Dr. Slowik and Dr. Brown, both of whom were acceptable medical sources.  See 20 C.F.R. § 416.902 (eff. Jun. 13, 2011 to Mar. 26, 2017) (noting that "acceptable medical sources" include treating sources, nontreating sources, and nonexamining sources.).  As a result, ALJ Draper was well within her discretion to assign "little weight" to N.P. Little's opinion. T. 23; see e.g., Jeffrey C. v. Berryhill, No. 6:18-CV-505 (FJS/DJS), 2019 WL 3361256, at *5 (N.D.N.Y. May 22, 2019) (noting that it is within the ALJ's discretion to determine what weight to assign the opinion of a nurse practitioner) (subsequent history omitted).

Turning next to Dr. Slowik, ALJ Draper assigned her opinion "partial weight," noting that although some of the mental restrictions were medically supported, others were not.  T. 22.  In particular, ALJ Draper noted that plaintiff's "performance on his mental status examination, including his inability to complete serial threes and perform mathematical calculations, supports her opinion regarding plaintiff's limited ability to perform complex tasks" and the corresponding limitation on his limitation to simple work with few workplace changes and restricted social interactions.  T. 22.  However, ALJ Draper rejected Dr. Slowik's moderate to marked limitations in plaintiff's ability "to maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, and appropriately

deal with stress[.]"  T. 337.  In rejecting that assessment, the ALJ concluded that the marked range of limitations was not supported by Dr. Slowik's own mental examination, as well as other record evidence.  T. 22; see T. 315 (noting normal judgment and insight, normal orientation to person, place, and time; intact recent and remote memory; and normal mood and affect); T. 319, 323, 329, 473, 477, 480, 483.  ALJ Draper also observed that although plaintiff was admitted to CPEP on February 21, 2017, "[d]uring his hospitalization, he "showed no suicidal tendencies, denied any suicidal ideation and showed virtually no signs of depression."  T. 391.  Although plaintiff was anxious and stressed about his children and other life stressors when he began outpatient treatment following that CPEP admission, he nonetheless maintained fair concentration, attention, insight, and judgment.  T. 456-470.  Accordingly, ALJ Draper was within her discretion to afford "partial weight" to Dr. Slowik's opinion.  T. 23.

With respect to Dr. Brown—whose opinion conflicted somewhat with that of Dr. Slowik—ALJ Draper assigned that opinion "some weight."  T. 21.  In brief, ALJ Draper observed that the restrictions assigned to plaintiff by Dr. Brown—which resulted from his comprehensive record review, were "generally consistent with the overall evidence of record"—including plaintiff's hearing testimony, hospitalization records, and brief therapy treatment notes.  T. 21-22.  ALJ Draper also credited Dr. Brown's rejection of the "marked" limitations opined by Dr. Slowik, stating:

> The moderate to marked memory and attention impairment noted [by Dr. Slowik] do not seem mentioned, supported or potentially explained by anything else in records.  Lourdes [medical records] indicates intact.  CE ADLS, Independent in personal ADLs, does child care, prepares simple meals, socializes with friends, helps with housekeeping chores, shops, manages money, goes fishing, plays video games.

T. 70 (errors in original).  Although Dr. Brown's opinion—like Dr. Slowik's opinion—pre-dated plaintiff's CPEP admission, see T. 388-93, his opinion is still useful in determining plaintiff's RFC and there no legal requirement that opinion sources have access to the complete record.  See Stottlar v. Colvin, 15-CV-0340 (GTS), 2017 WL 972108, at *7 (N.D.N.Y. Mar. 10, 2017) ("As an initial matter, a medical consultant's failure to consider the complete medical record does not necessarily compel rejection of the medical consultant's opinion "or the ALJ's finding relying thereon.'").  Likewise, the ALJ was entitled to partially rely on an opinion from a medical consultant because he is considered a qualified expert in the field of social security.  See Frye ex rel. A.O. v. Astrue, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order); Little v. Colvin, No. 5:14-CV-63 (MAD), 2015 WL 1399586, at *9 (N.D.N.Y. Mar. 26, 2015).  Accordingly, ALJ Draper was within her discretion to afford "some weight"  to this opinion.  T. 23.

Taken as a whole, it is well-settled that "the [Commissioner's] finding will be sustained if supported by substantial evidence, . . . even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner]."  Rosado, 805 F. Supp. at 153 (internal citations omitted).  After reviewing the evidence of record, the undersigned concludes that the ALJ's decision to discount the opinion of N.P. Little—who was not an acceptable medical source—is supported by substantial evidence.  Likewise, the ALJ's decisions to assign "some weight" and "partial weight" to the opinions of consultative examiners Dr. Brown and Dr. Slowik is likewise supported by substantial evidence.  The ALJ's RFC did not need to perfectly correspond with any one medical opinion; rather, the ALJ was entitled to weigh all of the evidence and formulate an RFC that was

consistent with the record as a whole.  See Matta, 508 F. App'x at 56.  Accordingly, the undersigned concludes that remand is inappropriate on this basis.

**2.  Whether the ALJ Failed to Assess Work Pace and Attendance Limitations**

Plaintiff argues that the ALJ failed to properly assess limitations with respect to work pace and attendance.  See Dkt. No. 9 at 8-11.  According to plaintiff, the undisputed record evidence indicates that plaintiff is unable to meet employer standards in those categories.  See id. at 8-9.  Relying principally on the Second Circuit's decision in Balsamo v. Chater, 142 F.3d 75 (1998), plaintiff argues that the ALJ arbitrarily substituted her own judgment for competent medical opinions because N.P. Little and Dr. Slowik found an "inability to meet employer demands for work pace and/or attendance and there is no contrary opinion."  Id. at 11  The undersigned's careful review of the ALJ's decision does not support plaintiff's arguments.

Work pace and attendance both "fall[] under the category of concentration and persistence," Lowry v. Comm'r of Soc. Sec., No. 15-CV-1553 (GTS/WBC), 2017 WL 1290685, at *4 (N.D.N.Y. Mar. 16, 2017), report and recommendation adopted, No. 15-CV-1553 (GTS/WBC), 2017 WL 1291760 (N.D.N.Y. Apr. 6, 2017), which "'refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.'"  Cox v. Astrue, 993 F. Supp. 2d 169, 182 (N.D.N.Y. 2012).  The Second Circuit has determined that a moderate limitation in the area of concentration, persistence, or pace does necessarily preclude the ability to perform unskilled work. See Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010)); see also Matta, 508 F. App'x. at 55 ("The ALJ found that

plaintiff had moderate difficulties in concentration, persistence and pace . . . that limit [him] to simple, routine, low-stress, and unskilled tasks, which involve no more than minimal contact with co-workers, supervisors and the general public.") (internal quotation omitted); Whipple v. Astrue, 479 F. App'x 367, 370 (2d Cir. 2012) (summary order); Andrea N. v. Saul, No. 3:18-CV-1186 (CFH), 2020 WL 1140512, at *6 (N.D.N.Y. Mar. 9, 2020) ("Accordingly, because the record evidence establishes that plaintiff has, at most, a moderate limitation in maintaining a regular work schedule and work-pace and the RFC specifically limits plaintiff to light work that involves only simple, routine tasks with minimal contact with coworkers, supervisors, or the public, the RFC adequately 'accounts for [the plaintiff's] limitations for performing activities within a schedule and maintaining regular attendance.'").

The three relevant sources—Dr. Slowik, N.P. Little, and Dr. Brown—each determined that plaintiff was limited, in some way, with respect to the domain of concentration, persistence, and pace.  See Dkt. No. 9 at 3-7.  More  specifically, (1) N.P. Little opined that plaintiff exhibited "extreme" limitations in his ability to maintain attention and concentration and maintain regular attendance without interruptions from psychological bases symptoms and "marked" limitations in all other areas, see T. 433; (2) Dr. Slowik opined that plaintiff was "moderately to markedly" limited in his ability to maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, and appropriately deal with stress, see T. 337; and (3) Dr. Brown opined that plaintiff was "[m]oderately limited" in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, to perform activities within a schedule, maintain

26

regular attendance, and be punctual within customary tolerances, and work in coordination with or in proximity to others without distracted by them, see T. 68-69.

The ALJ determined that plaintiff has a moderate limitation with regard to concentration, persistence, and pace. See T. 17. In so holding, ALJ Draper observed that although plaintiff self-reported that he was easily distracted and has trouble sustaining attention, that contention was belied by evidence that plaintiff had sustained attention to go fishing, watch television, play video games, and use his cell phone. See T. 70, 296, 337. In addition, several mental status examinations also revealed that plaintiff fair attention and concentration. See, e.g., T. 457. When ALJ Draper formulated the RFC, she concluded that plaintiff is capable of performing tasks learned in 30 days or less involving simple, work-related decisions requiring little to no judgment with only occasional workplace changes, no interaction with the public and no more than occasional interaction with coworkers or supervisors. See T. 19-24. As a result, to the extent that plaintiff argues the RFC failed to account for his work pace limitations, that contention is belied by the express language of the RFC. See, e.g., Eby v. Colvin, 227 F. Supp. 3d 275, 279-80 (W.D.N.Y. 2017) ("The RFC determined by the ALJ, which limits [the] plaintiff to performing low-stress, goal-oriented work[—] and not production pace work[—]involving only simple tasks, adequately accounts for [the] plaintiff's moderate limitations in attention and concentration.").

Turning next to attendance, the undersigned concludes that plaintiff's argument is also without merit. Although N.P. Little and Dr. Slowik opined higher limitations in that area, Dr. Brown specifically concluded that plaintiff was "[m]oderately limited" in his "ability to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances." T. 68. As previously explained, ALJ Draper properly afforded little weight to the opinion of N.P. Little, partial weight to the opinion of Dr. Slowik, and some weight to the opinion of Dr. Brown. In any event, "the ALJ is not obligated to reconcile explicitly every conflicting shred of medical testimony." Dioguardi v. Comm'r of Soc. Sec., 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (internal quotation marks and citations omitted). Here, although ALJ Draper specifically adopted the attendance limitation that was opined by Dr. Brown, it bears noting that to the extent that ALJ Draper rejected other portions of his opinion, there is no "absolute bar to crediting only portions of medical source opinions.". Younes v. Colvin, No. 1:14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015).

Contrary to plaintiff's argument, this was not a situation where the ALJ arbitrarily substituted her own judgment for competent medical opinion. See Balsamo, 142 F.3d at 81. Because it was an administrative finding, ALJ Draper bore the final responsibility for determining plaintiff's RFC and she was well within her discretion to formulate an RFC that was based upon the record as a whole, even if the RFC did not reflect any one opinion in its entirety. See Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 9 (2d Cir. 2017) (summary order); see Matta, 508 F. App'x at 56 (noting that an ALJ's RFC does not need to "perfectly correspond with any of the opinions contained in the record"). It is apparent that ALJ Draper considered plaintiff's capacity for work pace and attendance, and reasonably rejected portions of Dr. Slowik's opinion in favor of Dr. Brown's, while outright rejecting N.P. Little's opinion. See Cichocki, 729 F.3d at 178 n.3 ("An ALJ need not recite every piece of evidence that contributed to[his] decision, so long as the record permits [the reviewing court] to glean the rationale of an ALJ's

28

decision."). Accordingly, the undersigned concludes that remand is inappropriate on this basis as well.

**B. Whether a Level Two SVP is Inconsistent with Plaintiff's Social Restrictions**

Plaintiff argues that the ALJ's determination that the plaintiff is capable of performing a job with a level two SVP is inconsistent with plaintiff's social restrictions. See Dkt. No. 9 at 20-21.  More particularly, plaintiff argues that a level two SVP—which indicates that plaintiff can learn new work within thirty days or less—is incompatible with the restrictions on plaintiff's interactions with co-workers or supervisors.  See id.  In so arguing, plaintiff presumes—without any authority—that a thirty-day window for job training requires close interactions with others, as well as increased oversight.  See id. The undersigned finds that plaintiff's argument is entirely speculative and without merit.

Each job that is listed in THE DICTIONARY OF OCCUPATIONAL TITLES ("DOT") is described by reference to various components.  One such component—SVP—"is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  DOT, app. C (4th ed., 1991), available at 1991 WL 688702.  "The DOT has set out nine levels of training from [SVP level one], which requires training time of only a short demonstration of the job tasks, to [SVP level nine], which requires training time of over ten years."  Cross v. Astrue, No. 08-CV-0425 (VEB), 2009 WL 3790177, at *7 (N.D.N.Y. Nov. 12, 2009).  "A job with an [SVP level two] requires 'anything beyond a short demonstration up to and including one month.'"

Polynice v. Colvin, No. 8:12-CV-1381 (DNH/ATB), 2013 WL 6086650, at *17 (N.D.N.Y. Nov. 19, 2013), aff'd, 576 F. App'x 28 (2d Cir. 2014).

Another such job component—"People"—denotes "the degree of interaction with other people that the job requires." Duncan v. Colvin, No. 13-CV-0189, 2014 WL 2004386, at *6 (N.D. Okla. May 16, 2014), aff'd, 608 F. App'x 566 (10th Cir. 2015); DOT, app. B (4th ed., 1991). "The DOT rates the amount of interaction with people on a scale of 0-8, with 8 representing the lowest possible level of human interaction that exists in the labor force." Lane v. Colvin, 643 F. App'x 766, 770 n.1 (10th Cir. 2016) (summary order); Star v. Colvin, No. 12-CV-201 (FHM), 2013 WL 1788581, at *2 (N.D. Okla. Apr. 26, 2013).

In this case, the ALJ outlined three examples of jobs that plaintiff could perform in the national economy: (1) stubber (DOT code 222.687-034); (2) spiral binder (DOT code 653.685-030); and (3) pork cutlet maker (DOT code 529.686-022). See T. 25. Each position had the same SVP; that is, a level two. In addition, each position is also described as an "8," which is "the lowest possible level of human interaction that exists in the labor force." Lane, 643 F. App'x at 770 n.1. As a result, the jobs suggested by the vocational expert were squarely within plaintiff's social limitations. T. 19.

The undersigned would reach the same conclusion when reviewing the precise requirements of each position. With respect to the stubber position, the DOT describes the job as follows:

> Removes sales-slip stubs from packages at loading dock and sorts stubs, according to size of package or type of merchandise, to keep record of store deliveries. Returns illegibly addressed or mutilated packages for rewrapping or readdressing. Totals number of stubs at end of day and prepares report.

30

DOT 222.687-034, 1991 WL 672136.  With respect to spiral binder, the DOT describes

that position as follows:

> Tends machine that forms, inserts, trims, and fastens spiral
> binding in covers of paper goods such as booklets,
> pamphlets, and notebooks: Measures guides, using ruler,
> and positions or adjusts guides to accommodate size of
> sheets to be bound. Tightens setscrews to secure guides in
> specified position.  Starts machine.  Positions and holds
> items to be bound inside guide stops of machine and
> depresses pedal to form, insert, cut off, and crimp ends of
> spiral binder.  Stacks bound items on skid.  Removes broken
> pieces of wire from machine, using pointed pliers.  Removes
> and replaces damaged covers and backs.  May thread wire
> into machine.  May manually start preformed spiral in
> perforated holes of items to be bound and hold spiral against
> rubber-covered spindle or wringer-like rollers which twist
> spiral into remaining perforations.

DOT 653.685-030, 1991 WL 685807. With respect to pork cutlet maker, the DOT

describes that occupation as follows:

> Feeds machine that shreds and presses pork into cutlets:
> Cuts strips of pork into pieces, using knife.  Dumps cut meat
> into feed hopper of machine that automatically shreds meat,
> presses shredded meat into cutlets, and stacks cutlets on
> waxed paper dividers.  Weighs and packs cutlets into
> cardboard carton on weighing scales, according to work
> ticket specifications.  Seals carton, using pneumatic staple
> gun.

DOT 529.686-022, 1991 WL 674721.  Accordingly, these job descriptions do not reflect

that contact with others is required, which is consistent with the "People" job

component, as well as the social limitations contained in plaintiff's RFC.  In addition,

plaintiff has not pointed to any authority that would lead the undersigned to conclude

that a level two SVP equates to increased oversight and interaction with others due to a

training or probationary period.  As a result, the undersigned concludes that remand on this ground is not appropriate.

## C.  Whether the Step Five Determination was Supported by Substantial Evidence

At step five, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  See DeChirico, 134 F.3d at 1180 (citing Berry, 675 F.2d at 467); see also Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 445 (2d Cir. 2012) ("At [step five], the burden shifted to the Commissioner to show there is other work that [the plaintiff] can perform.").  In that respect, "[a]n ALJ may rely on a vocational expert's testimony regarding a hypothetical [question] as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion' [and] . . . [the hypothetical question] accurately reflect[s] the limitations and capabilities of the [plaintiff] involved." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014) (quoting Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983) (citing Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981)). "If a hypothetical question does not include all of a [plaintiff]'s impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability."  Pritchard v. Colvin, No. 1:13-CV-945 (DNH/CFH), 2014 WL 3534987, at *10 (N.D.N.Y. July 17, 2014) (citing Melligan v. Chater, No. 94-CV-944S (WMS), 1996 WL 1015417, at *8 (W.D.N.Y.1996)).

Here, when ALJ Draper proceeded to step five, she concluded that plaintiff was capable of performing at least three jobs that existed in significant numbers in the

national economy.  See T. 24-25, 54-59.  Plaintiff argues the step five determination

was not supported by substantial evidence "because it is based on an incomplete

hypothetical that fails to take into account the full extent of [p]laintiff's impairments,

including [his] work pace and/or attendance[.]"  Dkt. No. 9 at 21; Dkt. No. 12-1 at 3-4.

As outlined supra, however, the ALJ's analysis of plaintiff's impairments, RFC, and the

opinion evidence is supported by substantial evidence and the hypothetical questions

proposed to the vocational expert properly reflected the RFC limitations.  See T. 54-59.

Plaintiff has not demonstrated that further limitations—including additional restrictions

on his work pace and/or attendance—were warranted.  The vocational expert testimony

was based upon a hypothetical that accurately reflected the RFC and the ALJ, in turn,

properly relied on such testimony in order to conclude that plaintiff was able to perform

other jobs existing in significant numbers in the national economy.  See T. 24-25, 54-59.

Accordingly, the undersigned concludes that the ALJ's step five determination is

likewise supported by substantial evidence. As a result, remand is not warranted on this

ground.


## V. Conclusion

**WHEREFORE**, for the reasons stated above, it is hereby:

**ORDERED**, that the Commissioner's determination is **AFFIRMED**; and it is

further

**ORDERED**, that plaintiff's motion (Dkt. No. 9) is **DENIED** and it is further

**ORDERED**, that the Commissioner's motion (Dkt. No. 11) is **GRANTED**; and it is

further

**ORDERED**, that the Clerk of the Court serve copies of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 3, 2020
   Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

34